Mr. Stutter, whenever you're ready. May it please the Court. This appeal is about whether a reasonable employee is expected to remain on the job after his supervisor assaults him and threatens him with future violence, and the agency fails to fix the situation. At this stage of the proceedings, we take Mr. Henley's allegations as fact, and accordingly, on March 30, 2011, Henley was confronted by his direct supervisor, Dennis Vaught. Vaught told him, and I quote, Your father went to prison for killing your brother. Too bad he got the wrong one. He should have got you. Vaught then offered his hand in a fake apology, and once he had secured Mr. Henley's hand, he further threatened him, We're going to get this fixed real soon, and then you'll be gone. It's unthinkable that an employee of the United States government should be treated this way. And no reasonable person would remain on the job unless the agency fixed the situation. But as Mr. Henley alleged here, the agency failed to fix it. Although he told the center director, Walter West, on the same day what had happened, no action was taken against Mr. Vaught. But I don't understand. Wasn't, didn't the agency separate the two gentlemen and said, say, for each of, you know, for each of your protection or whatever, you're going to work from remote locations or something? I mean, didn't you say no action was taken? I feel like, I thought, maybe I'm, maybe I'm conditioning this case with another case. No, you're correct that Mr. Henley was- I thought some action was taken to protect Mr. Henley from any possible further incident related to this man. Yes, there was some action taken. Mr. Henley was placed on administrative leave. At first he was told- Continued to get paid. He did continue to get paid. Yeah. And he was told he would remain on administrative leave until an investigation had concluded. However, while he was still employed at the agency, there was no meaningful investigation that took place. The, for example, the investigation- But he still had a job, and he was still continuing to get paid, and he was put in a scenario where he was not being threatened by this man. So, didn't the agency take some steps? It took some steps, but it didn't fix the situation. Because, you know, if you look back in the history between Mr. West and Mr. Henley, there was, Mr. West just plain didn't like him. He had taken actions against him in the past, notably two of Mr. Henley's direct supervisors. So, to be clear, Mr. West is in charge of the center. He supervises the academic manager. How long was he on administrative leave? Because you said, and then they didn't do the investigation they promised to do while he was on leave. How long was he on leave for while they failed to do that investigation? Well, he was on administrative leave until- For how long? Until April 14th, so that was about a little bit more than two weeks. Okay, so wait. So they told, they put him on administrative leave while they were going to do the investigation, and your claim is, but they didn't do what they said they were going to do. I mean, this is the government. Two weeks doesn't seem like a really long time. So they did allow him to work from home, right? I mean, after the administrative leave ran out, they allowed him to work from home. Well, they recalled him to the job center, and he was supposed to work at the job center, but he was not put back into his duties. He was placed in the same building where Walter West could keep a close eye on him at all times. But the complaint here is not that they didn't investigate in the two weeks. It's when he came back to the center, it was clear to him that no investigation was underway, and I believe it was May 9th. So over a month, or May 11th, he reached out to upper management because he realized Walter West wasn't going to provide any meaningful investigation. And I think our position is that when someone is subjected to this sort of horrible treatment, they are entitled to an investigation. And it was reasonable for Mr. Henley to infer, particularly from his past interactions with Walter West, that no investigation was ever going to take place. And in fact, the investigation form that the government relies on, that EEOC report, and Mr. West's testimony to investigators supports the idea that no investigation took place while Mr. Henley was in his employment. Even though on April 4th of 2011 an investigation was initiated, is it that – I don't understand. Are you just saying it was formally initiated but it wasn't actually occurring? I thought the record showed – So the – if you look at page 40 of the appendix – I thought the record showed that an investigation began on April 4th. But correct me if I'm wrong. If I don't have the facts right, I definitely want to be told. Page 40 of the appendix indicates that his complaint was referred for investigation on November 8th. So that would be about six to seven months after he had initially reported the incident. And to be clear, a large part of this case is the prior history between Mr. West and Mr. Henley. Mr. Henley alleged that at West's direction two of his direct supervisors had issued letters critical of his job performance and, in fact, threatened performance improvement plans, which we noted as a major step toward termination, and that was without ever observing his teaching methods. It's a reasonable inference for him to draw that he was trying to – that Mr. West was trying to push him out. Okay, I guess – I understand what you're saying, and I appreciate what you're saying, but we get a lot of these cases, and the cases are because someone has been pushed out, and then they file an appeal and they claim either it's because of discriminatory reasons or retaliatory reasons. But in this instance, you're saying because he thought he was going to be pushed out unfairly, therefore this is a constructive discharge. It's not because he thought he was going to be pushed out unfairly, Your Honor. It's because he had a hostile working environment. We're relying primarily on the Heining case and then the Bates case, which stands for the idea that a pattern of harassment and or retaliation gives rise to intolerable working conditions really under two situations or two sets of facts. The first in Heining is what I'd refer to as kind of a death by a thousand cuts where there are repeated actions taken against someone that undermine their employment. It leads so that they cannot possibly get a meaningful chance of promotion. They can't get fair reviews. And at a certain point, a reasonable person says, you know what? I've had enough. And the basis here is that the agency has to go through proper procedures to terminate someone, and they can't terminate someone through improper acts, and that would be the intolerable working conditions in Heining. We believe this case bears a great deal of similarity to Heining and, in fact, is Heining plus because you have this long pattern of harassment and or retaliation undermining his employment but also an assault. And we also think it bears some similarity to Bates. Bates is the idea that one sufficiently severe incident can trigger an involuntary resignation. But what is the time period between which the alleged assault occurred and the time he died? A little bit under two months, but there is an explanation for that. As the government has noted and the board noted, there is a requirement that an employee act reasonably, that they do not jump to conclusions, that they give basically the agency a chance to fix things, and that's what he did. So after the incident, he remained in his job. He asked for an investigation. When it became clear to him that Walter West wasn't going to provide an investigation, he reached out to the director of the Forest Service who told him that the national director of Job Corps would investigate his claim and be in touch with him on May 23rd, no later than May 23rd. Mr. Henley waited until that day, and when he didn't get the communication, he realized he wasn't going to get the proper relief. He had two choices, which was to resign or to await the next retaliatory act. And Heining is clear he was not required to sit there and wait for the next retaliation, and that's particularly true here where there had been use of physical force against him. Can I ask you an aside? I mean, listening to your argument and certainly reading the briefs, including the Gray brief, it looks like assuming this were treated as a constructive discharge, your allegations would all go to the basis for this where it's improper because it was retaliation because your client wasn't liked or had this bad antagonistic relationship with Mr. West, or that's his name. What about, as I understood the record, you've got an EEO allegation here, this is sort of a mixed case allegation to the extent it's a discharge case at all. It's a mixed case, right? I think that's right, but if you look at the Bates case, for example, in the Bates case the board had found that there was no evidence that she was discriminated based on her sex. But nevertheless, they found in her favor, because it was a constructive discharge, that there was a hostile working environment that caused her to resign, and that's not permissible. The agency can't create the situation that causes them to resign. And so she was entitled to relief in the form of – I'm not exactly sure at this point, but she was, I think, ordered reinstated and ordered back pay. So it would be a similar type of claim to in Bates, and we think that the proper – If you were to prevail on the fact that this was a constructive discharge, then you would prevail on the fact that it was improper and your client should get reinstated. That's right, but this decision wouldn't be deciding that. He's asking for a very modest relief in that he just wants the board to decide this on the facts. So we are solely – Decide what, though? That's what I'm asking about. To decide whether it was an actual – yeah, to decide whether it was an intolerable working condition. Okay, so then he's got a discharge. Wait, so yeah, so he's got a discharge and what, a reinstatement because he was forced to resign because of intolerable working conditions? That's correct. And what happens when he goes back? I mean, you're saying he left because it was so intolerable and they hadn't taken any action against the other person. What's – is he assuming that that would be corrected necessarily? Well, I should correct that and say I'm not sure exactly what relief he would ask for on remand. I know that's one version of relief available to him, but the board has broad discretion in the relief that it grants. So it may be that he doesn't seek reinstatement, that he seeks just back pay or something similar to that. But at the least, we would suggest that it is serious – his allegations are serious and they deserve to be decided on the facts. The Chief Judge asked you about this being a mixed case and it started out that way. You alleged discrimination on the basis of disability and age, right? That's what he had initially alleged to the EEOC. And the Supreme Court granted cert in a case from the D.C. Circuit on mixed cases in January. Did you know about it, the Perry case? I'm not familiar with that, no. Well, I was going to ask whether you thought this case ought to be held until that case is decided or if it has any effect on this case. I don't think so. But since you don't know about the case, we don't want to speculate. Yeah, I don't want to speculate on that. My last point would just be that one other reason not to confirm and to remand to the board is the potential message that this sends. Because Mr. Henley is really asking this court, do my allegations establish intolerable working conditions? And to hold that they don't is to necessarily say that his allegations were only tolerable working conditions. And it's beyond dispute that his allegations included what would constitute assault and battery at common law and perhaps simple battery under a criminal statute. We think those are serious allegations, and when those are made, the government has to promptly investigate. It can't wait. Am I wrong, or is the legal standard applied here really whether or not he had no other alternative but to resign, right? So we would have to conclude that he exercised all efforts to complain about this, to tell his supervisors, to do all of this stuff. And he was absolutely reasonably satisfied that nothing was ever going to change and that this would continue. Well, I would amend that to say he has to make all reasonable efforts. And I would also point out that that was the same standard, the one that you just recited. It's the same standard applied by Heining and Bates. And I think the best way to address this case is to compare it fact by fact with Heining, Heining in particular, but also with Bates. Heining was a – just to be sure, because that's an MSBB case. That's not one of our cases, right? That's right. Those are both board cases. That's right. But I would compare it side by side with Heining, and I think that you'll find that our case is Heining plus, which is Heining plus the assault and battery allegation. Why don't you reserve the remainder of your rebuttal, and we'll hear from the government. All right. Thank you, Your Honor. Good morning. Are you familiar with that Perry case I asked about? I am, Your Honor. Is this case properly in our court? Well, this case is properly in this court under Conforto and under Perry as the D.C. Circuit decided it. I think the question you raised is whether this case should be stayed based on the grant of certiorari. We don't really have an opinion on that, but I don't think it would be improper since it does affect whether this court has jurisdiction. If the Supreme Court were to reverse Perry, which would also implicitly reverse the Conforto case that talks about how you – where you appeal mixed cases from the MSBB, then presumably that case would actually be properly in the district court as a mixed case rather than here. So we would be compelled to transfer? So you would be compelled to transfer it, and actually the inquiry in the district court would be entirely different. It would be on the facts. He would have a trial de novo as opposed to assessing whether the board had jurisdiction. So the – But on the – it would be a trial on the facts, but the initial inquiry would be what, whether or not he was constructively discharged? I believe so. I mean, I think a mixed – so the Conforto and Perry cases, we would consider this – as they stand before the Supreme Court rules, we would consider this more of a potential mixed case as in he raised discrimination allegations, but they do not attach until the board finds that it has jurisdiction, which obviously didn't occur here. In a true mixed case, after the board finds it has jurisdiction, it adjudicates the – all the issues, including the discrimination claims. Those are then appealed to the district court, and they get a trial de novo on the fact issues, and I think the legal issues are reviewed under a deferential standard similar to what's done in this court. I'm sorry. Can I just be clear? Yes. So if this was sent to the district court, it would be still an appeal of the MSPB's dismissal for lack of jurisdiction. So would it not be the threshold issue before the district court as to whether or not there's jurisdiction? I think the situation has never occurred because the jurisdiction of dismissals have never foregone to district court. They've always come to this court. I know, but we're talking about a scenario in which the Supreme Court reverses Perry and Conforto. If they reverse Perry, then I would assume it would follow the similar course to what the Supreme Court originally held in the case called Klopner in 2012 in which they held that even though the MSPB dismissed the case on procedural grounds, it went off to district court just like a case that was decided on the merits and would be heard under 5 U.S.C. 7702, which specifies a trial de novo on the discrimination claims. And so it would be – so the trial, if it went forward in district court, would go forward entirely on the merits, and it would sort of skip right over this issue that we're being asked to decide. I think that's right. I mean, I can't speak for the district court or for what exactly the Supreme Court would hold. I guess that the – certainly it seems to me Mr. Henley would have a very strong basis for wanting us to stay this case because if Perry comes out the other way by the Supreme Court, he gets to jump right over this jurisdiction issue and gets to automatically, under the government's view of what could happen, present all of his facts. He's not my client, so I can't speak for him, but I would assume he would find that to be in his interest. And the MSPB really – I think that's a reasonable thing to do. We take no position on whether you should do it. We certainly wouldn't oppose it if that's what he wanted to do. So you wouldn't oppose it if he wanted to stay? We would not oppose it. You might want to address that on the follow-up. Perry has been accepted. It's going to be argued, I believe, next month. That could really change the landscape of how decisions are appealed for the MSPB. Well, it's going to be argued next month and we'll have a decision before June, so this is not a long-term proposition, staying this case. We're only talking about staying it a couple months. Exactly. Can we get to the merits – well, the merits of the jurisdictional question, that is, which is your friend described what he described in his briefing that's in the record about this incident with his supervisor. Why isn't that sufficient? I mean, wouldn't a reasonable person take that as, oh, my God, that's outrageous. I'm not comfortable. This is no way a person should have to confront these risks. I'm assuming there's a lot of incidents with supervisors, so I'm assuming you're referring to the handshake. Yes, yes, and the comment about his father. And the comment about his father. I mean, I don't think anybody would argue that these were acceptable things for a supervisor to be doing, but the standard is very demanding. It demands that the employee have no alternative but to resign. Well, he reported it. He did report it. Because he should. He expected – he was given some indication that he might get some satisfaction or some investigation or some action may be taken, and that reasonably appeared to be not forthcoming in the reasonable foreseeable future. Is that not right? Well, I would respectfully disagree with that because, in fact, they took immediate action. They separated them. They put him on administrative leave for approximately two weeks. As you noted, or it was just more noted, he was paid during that time. They then started giving him assignments, so he wasn't just sitting around twiddling his thumbs. He was actually doing work. He didn't like the assignments he was given, but he was given things to do. And he, in fact, didn't initiate an EEO complaint on this issue until May. Yeah, but things usually happen right in the reverse, which is if someone allegedly threatens someone, it's that person who's put on administrative leave and whose regular duties change while the investigation is going on. Well, I think that depends on the facts and the circumstances, and since there have been no factual findings here, I don't know that it's appropriate to second-guess the agency's decision. For example— But aren't we supposed to view this as all facts are as he stated them? Isn't that the procedural posture we're in? All facts are as he stated them for what he did, but the supervisor, for example, denied it, denied making the statement, denied threatening him, denied doing any of these things. And so while the board didn't make a factual finding, I think that perhaps goes to the reasonableness of what the agency chose to do in terms of separating them. He says that's unreasonable, but that's a conclusory statement. And it's also the case— Wouldn't it help you answer Judge Prost's question if you referred to the fact that when Mr. Henley was asked what he wanted in an email, he responded that he thinks the safest course of action would be for either himself or Mr. Vaught to be put on administrative leave. And so the agency actually gave him exactly the relief that he thought and argued was what he thought was appropriate under the circumstances. Exactly, and I was going to say that. Because it's kind of hard for me to imagine how putting him on administrative leave somehow creates a hostile work environment and or forces him to resign when it's exactly what he asked them to do. I would agree with that. I'm not sure it creates one anyway, but I think it certainly does not when it is one of the courses of action that he himself suggested and presented as appropriate, and they chose to do that. And I think the remaining things that happened in May where he was working out of his apartment, he couldn't get a good internet signal, so he worked around town. Then he went home without authorization to Michigan. These things, he characterizes them as efforts to entrap him into doing things he shouldn't do, but the fact is these are all appropriate things that his supervisors required. They required him to do some work. They required him to do it relatively close to the facility. They required him not to just disappear off to his house 10 hours away without prior authorization, and they required him to come back when they discovered he had disappeared and was AWOL. And if he disagreed that these were appropriate, he had means of redress. He could have filed a grievance on the AWOL claim. He eventually did, in fact, file an EEO complaint, but he didn't actually file that until about two weeks before he ultimately resigned. And so I think his claim that the proper procedures weren't followed and he didn't get process is simply inaccurate and unreasonable because the agency was following his procedures and he is the one who chose not to wait for the outcome in a reasonable amount of time. The court has no further questions. Thank you. Thank you. If the government is offering a stay, then we would be glad to accept it. No, they didn't offer a stay. They said they wouldn't oppose your request for one. Well, we are—then, yes, we are requesting a stay for that opinion. And I want to make two other points. The first is regardless whether the government was following procedures in investigating this matter, and I don't believe that they did. I don't believe there's any evidence showing that they were following procedures. I would still say that the law should not conform to the agency's procedures. The agency should conform its procedures to the law. And then I want to make one other point about the administrative leave issue. Mr. Henley disputed that that's what he requested. In Mr. Henley's allegations, what he's suggesting is that that was his last resort, that when Mr. West failed to take the actions that Mr. Henley expected of him, that is placing bought on administrative leave, this was, well, at the very least, you can't leave me around this guy. And the initial board decision actually recognizes this. First, I should give the site for his allegations. That would be Appendix 114 where he's saying that that was not his first choice, nor was it the first choice he communicated to Mr. West. And also at Appendix 16 in footnote 2, the board had acknowledged that it's not clear from the record whether Mr. West or the appellant recommended that the appellant be placed on administrative leave. So that should not be a basis in this court's decision. Thank you. We thank both parties in the case's support. That concludes our proceedings.